## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TAMMY R. JOSEPH,
    *Plaintiff,*

    v.

EXPERIAN INFORMATION SOLUIONS,
INC.,
    *Defendant.*

No. 3:24-cv-1757 (VAB)

## RULING AND ORDER ON MOTION TO COMPEL ARBITRATION, APPOINT AN ARBITRATOR, AND STAY ALL PROCEEDINGS

Tammy Joseph ("Plaintiff") has sued Experian Information Solutions, Inc. ("Experian" or "Defendant") alleging failure to follow reasonable procedures to assure maximum possible accuracy under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681e(b). Compl., ECF No. 1 (Nov. 5, 2024) ("Compl.").

Experian has filed a motion to compel arbitration before the American Arbitration Association under the Federal Arbitration Act. Mot. to Compel Arbitration, ECF No. 17 (Feb. 13, 2025).

For the reasons explained below, the Court **GRANTS** the motion to compel arbitration.

This case will be stayed, and administratively closed (without judgment being entered) until the arbitration proceedings have concluded.

## I.    BACKGROUND

### A.  Factual Background

Ms. Joseph alleges that Experian "prepared [a] patently false consumer report," erroneously stating she was "deceased" while she was in fact alive. Compl. ¶¶ 123–24. The

1

dissemination of this credit report allegedly led to Ms. Joseph being denied credit card applications, loans, and a refinancing of her mortgage. *Id.* ¶¶ 94, 103.

As a result of Experian's actions, Ms., Joseph allegedly has suffered "loss of credit, loss of ability to purchase and benefit from her credit rating, detriment to her credit rating; wasted time; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials." *Id.* ¶ 126.

### B.  Procedural Background

On November 5, 2024, Ms. Joseph filed her Complaint. Compl.

On November 27, 2024, Experian filed its Answer. Answer, ECF No. 13 (Nov. 27, 2024).

On February 13, 2025, Experian filed its motion to compel arbitration and an accompanying memorandum in support. Mot. to Compel Arbitration, ECF No. 17 (Feb. 13, 2025); Memo. in Supp. of Mot. to Compel Arbitration, ECF No. 17-1 (Feb. 13, 2025) ("Memo. in Supp.").

On February 18, 2025, Experian filed a motion to stay discovery until the resolution of the motion to compel arbitration. Mot. to Stay, ECF No. 18 (Feb. 18, 2025).

On February 28, 2025, Ms. Joseph filed a response to the motion to stay discovery. Response re Mot. to Stay, EF No. 20 (Feb. 28, 2025).

On March 6, 2025, Ms. Joesph filed a response to the motion to compel arbitration. Response re Mot. to Compel Arbitration, ECF No. 21 (Mar. 6, 2025) ("Response").

On the same day, Experian filed a reply in further support of its motion to stay discovery. Reply to Response to Mot. to Stay, ECF No. 22 (Mar. 6, 2025).

On March 7, 2025, the Court granted the motion to stay discovery and stayed discovery until the resolution of the motion to compel arbitration. Order, ECF No. 23 (Mar. 7, 2025).

On March 11, 2025, Experian filed a reply to the response to the motion to compel arbitration. Reply to Response to Mot. to Compel Arbitration, ECF No. 24 (Mar. 11, 2025) ("Reply").

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .  shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA enables any "party aggrieved" by the failure of another to arbitrate under a written agreement for arbitration to petition a United States District Court "for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4.

Courts follow a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). "A court may not deny arbitration where there is a valid arbitration agreement that covers the asserted claims." *Davis v. Macy's Retail Holdings, Inc.*, No. 3:17-CV-1807 (JBA), 2018 WL 4516668, at *2 (D. Conn. Sept. 19, 2018) (citation omitted).

In the context of a motion to compel arbitration brought under the FAA, courts apply "a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also McAllister v. Conn. Renaissance Inc.*, No. 3:10-

CV-1488 (WWE), 2011 WL 1299830, at *3 (D. Conn. Apr. 5, 2011) (applying summary judgment standard in the context of a motion to compel arbitration). The party seeking to compel arbitration must "substantiat[e] [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the other party agreed to arbitration. *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.* (citation omitted). If the evidence suggests a genuine issue of material fact, the court must summarily proceed to trial. *Bensadoun*, 316 F.3d at 175 (citing 9 U.S.C. § 4).

The court, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) ("The district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997))).

## III.    DISCUSSION

"When determining whether to compel arbitration pursuant to the FAA, a court looks to four factors: (1) whether the parties agreed to arbitrate their dispute; (2) whether the asserted claims fall within the scope of the arbitration agreement; (3) whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-arbitrable; and (4) if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the remaining claims pending arbitration." *Billie v. Coverall N. Am., Inc.*, 444 F.

Supp. 3d 332, 343 (D. Conn. 2020) (citing *JLM Indus., Inc. v. Stolt–Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)).

Experian argues that a valid agreement to arbitrate exists in the contract created through Ms. Joseph's enrollment in CreditWorks. Memo. at 7. In its view, under Connecticut law, Ms. Joesph created a contract because she "(1) [] had clear notice of the Terms of Use at the time she enrolled, (2) [] was admonished that, by clicking an adjacent button, she was agreeing to be bound by the Terms of Use; and (3) [] clicked the button, thereby manifesting her assent to the Terms of Use." *Id.* at 9. Experian Information Systems also argues that it is a party to the contract and arbitration agreement because the contract binds all affiliates of Experian Consumer Services, of which it is one. *Id.* at 10–11. Alternatively, Experian argues, it can enforce the contract as a third-party beneficiary. *Id.* at 11–14.

In response, Ms. Joseph argues that the declaration of Dan Smith, Director of Product Operations for Esperian Consumer Services (also referred to as Consumer.com, Inc.), relied upon by Experian is inadmissible because he lacks personal knowledge as to what Ms. Joseph experienced when creating her account. Response at 11–19. Ms. Joseph also argues that she did not have constructive notice of the contract because nothing required her to scroll through its terms or click on a box confirming her agreement, and the account creation webpage was not sufficiently clear as to the arbitration terms *Id.* at 20-24. Therefore, Ms. Joseph argues that a contract was not formed under Connecticut law.

In reply, Experian argues that Ms. Joseph failed to demonstrate that a reasonable consumer would not be placed on notice by the account creation process. Reply at 4–5. Experian also argues that the affidavit of Mr. Smith is admissible because it is based on his personal

knowledge "acquired in the course and scope of his job responsibilities and through the review or pertinent documents and internal records." *Id.* at 6.

The Court agrees, and will address each issue in turn.

### A.  The Declaration from Mr. Smith

Under Rule 56(c)(4) of the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Personal knowledge may be based on "personal observations over time" and "an affiant may testify as to the contexts of records [he or] she reviewed in [his or] her official capacity." *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000). The key question is "whether a reasonable trier of fact could believe the witness had personal knowledge." *Id.*

Mr. Smith has been employed by Experian's affiliate, ConsumerInfo.com, Inc/Experian Consumer Services, since January 2010. Smith Decl. ¶ 1, ECF No. 17-2 (Feb. 13, 2025) ("Smith Decl."). This role includes "supporting the consumer enrollment process into CreditWorks and related services." *Id.* Through this role, he is "familiar with ECS's electronic databases that store consumer enrollment information, including the webpages a consumer would have encountered to complete their enrollment into CreditWorks, . . . [and] which buttons the consumer would have clicked on in the enrollment process." *Id.*

Mr. Smith then describes the specific process for Ms. Joseph to enroll in CreditWorks:

> Based upon my review of [ConsumerInfo.com, Inc/Experian
> Consumer Services]'s membership enrollment data maintained in

6

the regular course of business, including data specific to Plaintiff's membership, on September 17, 2021, Plaintiff enrolled in CreditWorks. In order to successfully enroll, Plaintiff had to complete a single webform. The form required Plaintiff to enter her personal information—*i.e.*, her name, address, phone number, and e-mail address. After she entered her personal information, Plaintiff had to click the "Create Your Account" button on the webform in order to enroll. Immediately below the boxes to enter her e-mail address and password, was the following disclosure: "By clicking "Create Your Account": I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." A true and correct representation of the webform as it would have appeared when Plaintiff enrolled in CreditWorks is attached as Exhibit 1 to the this [*sic*] Declaration.

*Id.* ¶ 3.

Because of his position and job duties, Mr. Smith thus has familiarity with, and personal knowledge of, the Experian CreditWorks platform and enrollment process. *See, e.g.*, *Giallanzo v. City of New York*, 630 F. Supp. 3d 439, 458 (S.D.N.Y. 2022) ("Here, as Goldberg attested, he is DOT's director of labor relations, a position he has held since 1996. That position—and length of tenure—presumptively gives him broad familiarity with his agency's pay practices."). Furthermore, to the extent he relies on records of Ms. Joseph's enrollment, affiants may testify "as to the contents of records they reviewed in their official capacity," *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000), which Mr. Smith states he has done. *See, e.g.*, *id.* ("Affiants may testify as to the contents of records they reviewed in their official capacity. The documents to which Murphy refers in his affidavit are documents with which he reasonably would have become familiar in his official capacity."). And Mr. Smith supports his declaration testimony with documentary evidence of the enrollment process and Terms of Service. *See, e.g.*, *Searles*, 98 F. Supp. 2d 461–62 ("Moreover, the statements contained in her affidavit are supported by documentary evidence that she would be competent to introduce at trial. In consequence, her affidavit is admissible.").

7

Accordingly, a reasonable trier of fact could determine that Mr. Smith had personal knowledge of the CreditWork enrollment process, and his declaration is admissible. *See, e.g.*, *Borukh v. Experian Information Solutions, Inc.*, No. 24-cv-6022-NRM-JRC, 2025 WL 1220042, at *7 (E.D.N.Y. Apr. 28, 2025) ("[D]efendant has provided a more than sufficient basis for a reasonable trier of fact to conclude that Smith has personal knowledge of the facts pertaining to plaintiff's enrollment in CreditWorks.").

### B. The Validity of the Agreement

"The threshold question facing any court considering a motion to compel arbitration" is "whether the parties have indeed agreed to arbitrate." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012). "Whether parties have agreed to arbitrate is generally a question of state contract law." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023); *see also Nicosia*, 834 F.3d at 229 ("The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 27 (2d Cir. 2002))).

Under Connecticut law,[1] a contract is formed through an offer and an acceptance of that offer. *See Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co.*, 268 A.2d 391, 393 (Conn. 1970) ("It is elementary that to create a contract there must be an unequivocal acceptance of an offer." (citations omitted)); *Ubysz v. DiPietro*, 440 A.2d 830, 833 (Conn. 1981) ("[I]n order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties; . . . and the identities of the contracting parties must

---

[1] The Court applies Connecticut law as the parties do not dispute that Connecticut contract law govern the validity of the agreement in this case. *See, e.g.*, *Edmundson*, 85 F.4th at 702 (applying Connecticut law when "[t]he district court applied Connecticut law on the question of contract formation, and the parties do not challenge that decision on appeal"). In any case, "traditional contract formation law does not vary meaningfully from state to state." *Id.* at 702–03.

be reasonably certain." (internal citations omitted)). A party who agrees to a written contract has the duty to read the contract and is generally presumed to know of its terms. *See Phoenix Leasing, Inc. v. Kosinski*, 47 Conn. App. 650, 654 (1998) ("'The general rule is that where a person of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is [that person's] duty to read it and notice of its contents will be imputed to [that person] if [that person] negligently fails to do so[.]' . . . There was no evidence of coercion, fraud or mistake. Thus, the defendant had a duty to read the guarantee and cannot now plead his self-induced ignorance of its contents." (quoting *First Charter National Bank v. Ross*, 617 A.2d 909, 911 (Conn. 1992)) (alterations in original)). These principles "apply with equal force to contracts formed online." *Edmundson*, 85 F.4th at 703.

For online contracts, "where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a reasonably prudent person would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Id.* (internal citations and quotation marks omitted). To determine whether there has been sufficient notice, courts determine whether the web interface provided "reasonably conspicuous notice" of the agreement. *Id.* at 705. This inquiry is "fact-intensive" *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017), and can involve an assessment of whether the webpage is "uncluttered," whether the user has to scroll to find the notice of the contract terms and formation, and the font size, color, and placement of the notice. *Id.* at 78.

Here, the webpage includes the statement "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy." *See* Exhibit 1 to Smith Decl. The phrases "Terms of Use Agreement" and "Privacy

Policy" are hyperlinks in blue text. *Id.*; Smith Decl. ¶ 4 ("The phrase "Terms of Use Agreement" in the disclosure was off-set in bold blue text and, if clicked, would have presented the consumer with the full text of the agreement. That is, the phrase "Terms of Use Agreement" in the disclosure was a full text hyperlink to the Terms of Use."). This statement appeared above a few sentences stating that the user would also authorize for Experian Consumer Services to obtain the user's credit report. Exhibit 1 to Smith Decl. After the credit report authorization section, there is a button stating, "Create Your Account." *Id.*

If a user clicks on the "Terms of Use Agreement" hyperlink, they will be taken to a page that includes the full terms, *see* Smith Decl. ¶ 4, with an "Arbitration Agreement" clause that states "ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement . . . includ[ing], but [] not limited to: claims arising out of or relating to any aspect of the relationship between us . . . ." Exhibit 3, ECF No. 17-2 (Feb. 13, 2025). The agreement includes any Experian "parent entities, subsidiaries, [and] affiliates." It also designates for the arbitrator's consideration issues of "scope and enforceability of [the] arbitration provision." *Id.*

The notice of agreement to the terms appears reasonably conspicuous. The "dark print contrasts with the bright white background and the hyperlinks are in blue." *Meyer*, 868 F.3d at 78. The "user does not need to scroll beyond what is immediately visible to find notice of the Terms [of Use Agreement]." *Id.* And the screen is uncluttered, with only the notices and boxes for the user's personal information. *Compare id.* ("The Payment Screen is uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'"), *with Nicosia*, 834 F.3d at 237 ("Although it is impossible to say with

certainty based on the record, there appear to be between fifteen and twenty-five links on the

Order Page, and various text is displayed in at least four font sizes and six colors (blue, yellow,

green, red, orange, and black), alongside multiple buttons and promotional advertisements.").

As a result, any reasonably prudent user would understand that, when they clicked the

"Create Your Account" button, they would be agreeing to the Terms of Use contained in the

hyperlink. *See Edmundson*, 85 F.4th at 707 ("Reasonable internet users would understand that

selecting 'Confirm and continue' on the Klarna Widget constitutes their confirmation that they

'agree to the payment terms' and continues the user's transaction using Klarna's 'Pay in 4'

Service. As described above, a reasonable user could not avoid the notice of Klarna's terms,

which were hyperlinked in the statement, 'I agree to the payment terms.' Indeed, this statement

was placed directly above the "Confirm and continue" button, the interface was, as a whole,

uncluttered, and the terms were presented at a time when a reasonable user would expect to

receive them.").

The notice thus suffices for the creation of a binding agreement between Ms. Joseph and

Experian. *See, e.g.*, *Borukh*, 2025 WL 1220042, at *10 (assessing the same interface and finding

"that defendant has carried its burden of establishing that a valid agreement to arbitrate exists");

*DiTella v. TransUnion, LLC, et al.*, No. 23 Civ. 11028 (KPF), 2024 WL 3594567, at *5

(S.D.N.Y. July 31, 2024) (assessing the same interface and finding "that Defendant has

established by a preponderance of the evidence that a valid agreement to arbitrate exists");

*Cimillo v. Experian Information Solutions, Inc.*, 21 Civ. 9132 (VB), 2023 WL 2473403, at *7

(S.D.N.Y. Mar. 13, 2023) (assessing the same interface and finding that Experian "has

demonstrated the existence of an agreement to arbitrate").

Ms. Joseph's arguments to the contrary—while "not unreasonable," *Edmundson*, 85 F.4th at 708—are insufficient to change this conclusion.[2]

She states in her declaration that "to the best of her knowledge" she "never clicked anything indicating that [she] agreed to waive [her] right to a jury trial with Experian," and that had she "seen any such indication, [she] would not have signed up for an online Experian account." Joseph Decl. ¶ 2, Exhibit B, ECF No. 21-2 (Mar. 6, 2025) ("Joseph Decl."). There is no requirement, however, that a defendant provide explicit notice on the main webpage of each of the specific terms in the agreement; rather, they must provide notice sufficient to signify that a "'click' signifies assent" to terms included in the hyperlink. *Edmundson*, 85 F.4th at 708; *see also id.* ("Contrary to Edmundson's assertion, we have never held that 'a company must "explicitly advise[ ]" the user "that the act of clicking will constitute assent to [its] terms and conditions."' Rather, we have only required that the interface 'make clear' to the reasonable internet user that a specific 'click' signifies assent." (citations omitted)).

Ms. Joseph also argues that "any reasonable reader would [have] assume[d]" the authorization for Experian to retrieve the user's credit report consisted of the summary of the entire Terms of Use. Response at 22. But a "reasonably prudent" user would understand that the

---

[2] Ms. Joseph relies largely on the reasoning in *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016) and *Austin v. Equifax Information Services, LLC*, No. 3:22cv707, 2023 WL 8646275 (E.D. Va. Dec. 14, 2023), non-binding precedent from other Circuits. Significantly, since the filing of Ms. Joseph's brief, the Fourth Circuit reversed the district court's decision in *Austin. See Austin v. Experian Information Solutions, Inc.*, No. 23-2301, 2025 WL 217733, at *7 (4th Cir. Aug. 1, 2025) ("The district court erred by excluding the [company representative's] declaration on the basis that he had failed to demonstrate personal knowledge of [Plaintiff's] enrollment in CreditWorks.")**;** *see also id.* at *10 ("The record in this matter demonstrates that (1) [Plaintiff] had reasonable notice of an offer to enter into the contract and (2) that [the Plaintiff] manifested assent to it. The Federal Arbitration Act compels courts to ensure parties make good on binding agreements to arbitrate, so we reverse the district court's denial of [the company's] motion to compel arbitration."). And, considering the fact-intensive inquiry of the notice requirement, the interface in *Sgouros* lacks some of the defining features of notice provided here, such as the clear statement that clicking the "Create Your Account" button constitutes agreement to the Terms of Use. *See Sgouros*, 817 F.3d at 1032 (showing webpage where there is no clear statement that accessing service constitutes agreement to the terms of use).

hyperlinked "Terms of Use Agreement" provided the full terms, "and the burden was then on her to find out to what terms she was accepting" by clicking that link. *Edmundson*, 85 F.4th at 709.

Accordingly, Experian has demonstrated that a valid agreement to arbitrate exists.

### C. The Arbitrability of the Claims

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 70 (2019). There must be, however, "clear and unmistakable" evidence that the parties agreed to delegate issues of arbitrability to the arbitrator. *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021).

Here, there is such "clear and unmistakable" evidence: the contract states that all issues of "scope and enforceability" are delegated to the arbitrator. The arbitrability of a claim is squarely encompassed by that term. *See, e.g.*, *DiTella*, 2024 WL 3594567, at *7 ("Here, the Arbitration Agreement, in relevant part, provides that '[a]ll issues are for the arbitrator to decide including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions[.]' As have numerous courts before it, this Court finds that this provision—which delegates 'all issues' to an arbitrator, including all questions regarding enforceability and scope—indicates a 'clear and unmistakable intent' of the parties to submit arbitrability determinations to the arbitrator.").

Additionally, claims under the FCRA are routinely considered to be in the scope of broad arbitration agreements by courts in the Second Circuit. *See, e.g.*, *Ostreicher v. TransUnion, LLC*, No. 19-cv-8174 (KMK), 2020 WL 3414633, at *9 (S.D.N.Y. June 22, 2020) ("With respect to the FCRA, district courts within the Second Circuit regularly compel arbitration of such claims.") (collecting cases); *Robinson v. Macy's Inc.*, 772 F. Supp. 3d 253, 262 (D. Conn. 2025)

("Courts in this circuit have held that such 'expansive language' as that contained in the instant Arbitration Provision 'unambiguously' encompasses both FDCPA and FCRA claims.").

Accordingly, Ms. Joseph's claim is subject to arbitration, at least to determine the arbitrability of the claims.

## IV.    CONCLUSION

For the foregoing reasons, the motion to compel arbitration is **GRANTED**.

This case will be stayed, and administratively closed (without judgment being entered) until the arbitration proceedings have concluded.

This case may be reopened by motion of any party at any time, but no later than sixty (60) days after any final arbitration award or decision.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at New Haven, Connecticut, this 15th day of August, 2025.

  /s/ Victor A. Bolden

Victor A. Bolden
United States District Judge
